H2OJUSAC                         Conference

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                   Plaintiff,

 5              v.                           17 Civ. 274 JPO

 6   EQUITY RESIDENTAL
     ERP OPERATING L.P.,
 7
                     Defendants.
 8
     ------------------------------x
 9
                                             February 24, 2017
10                                           11:36 a.m.

11

12   Before:

13                      HON. J. PAUL OETKEN,

14                                           District Judge

15

16                         APPEARANCES

17

18   PREET BHARARA,
          United States Attorney for the
19        Southern District of New York
     BY:  LI YU,
20        JACOB LILLYWHITE,
          LAUREN LIVELY,
21        Assistant United States Attorneys

22
     BAKER & HOSTETLER, LLP (NYC)
23        Attorneys for defendants
     BY:  CRAIG MITCHELL WHITE, Esq.
24        TORELLO H. CALVANI, Esq.
                    Of counsel
25
```

H2OJUSAC                    Conference

 1            (In open court)

 2            THE COURT:  Good morning, everyone.  The first case is

 3  United States versus Equity Residential, 17 Civ. 274.

 4            (Case called).

 5            THE COURT:  Good morning.  All right.

 6            We're here to address the issues raised in the

 7  government's letter, dated February 6th, and defendants'

 8  response, dated February 9th.

 9            I have before me a request in this case by the

10  government for expedited discovery in the form of inspection of

11  apartments and common areas at the rental building at 170

12  Amsterdam Avenue, as I understand it, so let me hear first from

13  counsel for the government.

14            MR. YU:  Thank you, your Honor.

15            THE COURT:  Mr. Yu?

16            MR. YU:  Yes.

17            THE COURT:  Mr. Yu, could you first address, before

18  you go into whatever you want to focus on, could you first

19  address the first point made by defendants, which is that the

20  owners of the building have not been sued.

21            MR. YU:  Your Honor, in this case Equity Residential

22  is a major corporation that owns and operates and develops

23  properties across the country.

24            In this case, while it is the case that the direct

25  owner of 170 Amsterdam is not Equity, Equity is the parent of

1    the owner, and what we believe ultimately the facts will show

2    and we allege in the complaint is that Equity itself was

3    directly involved in the design and construction of this

4    building.

5            Under the prevailing standard under the Fair Housing

6    Act, when a party or an individual is directly involved in the

7    design and construction of a property, and if that property

8    does not comply with the requirements, that party is liable

9    irrespective whether or not it is the direct owner or further

10   up the corporate chain.

11           The kind of proof we expect to adduce, whether it is

12   at the preliminary injunction hearing coming up or at trial,

13   would be things like Equity's executives are directly involved

14   in making decisions about the design and construction decisions

15   as the properties developed, Equity's people controlling the

16   decision-making of the subsidiary that actually owns the

17   building.

18           THE COURT:  It is the ultimate owner, you're saying?

19           MR. YU:  The ultimate owner and ultimate

20   decision-maker, your Honor.  Your Honor, if I may sort of just

21   to start with, what we are seeking here is a single item of

22   discovery.  We are asking for an inspection of one building

23   that is controlled by Equity.

24           I'll begin with a very quick summary of the

25   background, and I kind of want to address four questions which

1    are raised in the briefing:

2            The first is how an inspection may shed different

3    light or produce different types of evidence from the testing

4    that has occurred already;

5            Second, the timing, why timing of the inspection is

6    important;

7            The third is why we haven't yet filed a PI motion,

8    which Equity raises; and

9            The last is whether or not there is undue burden.

10            So first in terms of background, your Honor, we

11    believe that this case really goes to the heart of the design

12    and construction of apartments.  Congress enacted a statute

13    because historically housing frequently didn't take into

14    account needs of people with disabilities.  In 1988, Congress

15    amended a statute to require that new housing built after 1991

16    must meet the basic requirements of accessibility.

17            So here Equity, as I mentioned, it owns a lot of

18    properties, some of which it actually acquires, but many of

19    those Equity self was involved in building.  We are focused on

20    the one Equity itself was involved in building.

21            As we described in the complaint, Equity was sued in

22    2006 in the District of Maryland for engaging in a pattern and

23    practice of Fair Housing Act violations, building a number of

24    properties, residential properties that did not comply with the

25    Fair Housing Act.

1          In March of last year, the court in Maryland, Chief

2     Judge Blake, I believe, actually entered summary judgment

3     against Equity, finding it, in fact, violated the Fair Housing

4     Act in design, accessible design and construction provisions in

5     relation to seven properties which are, I believe, in generally

6     three areas across the country; California, Massachusetts and

7     the Washington, D.C. area.

8          THE COURT:  This lawsuit is about how many properties?

9          MR. YU:  Your Honor, this lawsuit is directly about

10    the 170 Amsterdam Avenue property which is in Manhattan itself.

11         THE COURT:  Only about that property?

12         MR. YU:  As well as that property and as well as

13    injunctive aspect has to do, injunctive aspect of the case has

14    to do with five properties that we understand are currently

15    under construction or nearing the end of construction.  Those

16    are located in different areas in the country, some on the West

17    Coast and one or two in DC, and those are at least, according

18    to the public filings Equity has made, those are expected to be

19    completed in this calendar year, some in the spring and some in

20    the fall.

21         Given the background, so late October of last year

22    there was a testing done at 170 Amsterdam, and so there were

23    two testers who posed as renters who went there.  They looked

24    at four apartments, and just based on those four apartments

25    they looked at, they identified three types of inaccessible

1   conditions which are described in Paragraph 12 in the

2   complaint.

3          Now, I just want to clarify one issue about the

4   difference between testing and the inspection because Equity is

5   suggesting that well, if the buildings have already been

6   tested, why is there a need for further inspection?

7          The difference is testing by its nature is limited to

8   what apartments are available, and even though the testers are

9   briefly posing as potential renters or relatives of renters,

10  while they can take measurements, it is limited by how much

11  time there is and which apartments happen to be available at a

12  given time.  Here they could only see four apartments, when the

13  building itself, as defendants' counsel has explained, actually

14  has 26 types or 26 lines of apartments.

15         The difference is the inspection would be, an

16  inspection actually would involve, we ask for is for an

17  accessibility expert who is retained by the government to go in

18  there and look at each type of apartment.

19         THE COURT:  All 26 types?

20         MR. YU:  26 types of apartments, look at each type of

21  condition, and so it would be different in three ways:

22         One, it will be very objective.  We are going to

23  have -- these are photos we have from a prior inspection, for

24  example, where there is going to be objective record of each

25  condition, photograph of how it is measured and what the

1   measurement shows.  It will be systematic in the sense of the

2   inspector goes to the building, looks at every type of

3   apartment and every type of condition rather than him being

4   rushed in the context of looking at available apartments.  It

5   will be comprehensive.  There will be a report generated at the

6   end of the process.

7           All of this we believe is very helpful because to the

8   extent as we move forward into a preliminary injunction

9   proceeding, that will be a full record for the parties and for

10  the court to look at in terms of how many conditions there are,

11  whether they're pervasive conditions or isolated conditions.

12          THE COURT:  You acknowledge, I assume, that this is a

13  fairly significant hardship.  This is a rental building and the

14  landlord has to give notice.  You are walking into apartments

15  where people are living?

16          MR. YU:  Yes, your Honor.  I think we make this point

17  in the letter, and the idea -- let me take a step back.

18          We acknowledge, as per defendants, they do need to

19  give notice to their tenants at some point.  We are going into

20  these apartments.  Fundamentally, we don't think the issue is

21  going to be any different as the case moves forward because

22  here we are asking for doing this sooner, but because as we

23  understand from defendants' counsel, while the fundamental

24  disputes in this case on the facts is going to be are there in

25  accessible conditions and, if so, how many inaccessible

1     conditions there are at 170 Amsterdam Avenue.  That will be one

2     of the basic factual disputes in the case.

3              The way to resolve that at this stage or a later stage

4     will be through an inspection.  An inspection will need to take

5     place, in our view, no matter what happens in this case, and so

6     given that burden is not any different, it is simply a matter

7     of when this happens versus whether or not this happens.

8              Given the sequencing of that burden, we believe it

9     doesn't really change the dynamic especially given, if I may

10    briefly address it, some of the other concerns the government

11    has.  So there is a basic question about timing and irreparable

12    harm which defense raises here.

13             Timing is very important, in our view, because as we

14    mentioned earlier, and the thing is, as defendants' public

15    filings show, there are these buildings which are currently

16    under construction.  There 1500 or 1600 rental units in these

17    five buildings which would become available once construction

18    is completed.

19             Our concern is if, in fact, we have a history of

20    Equity building buildings with many types of inaccessible

21    conditions, we have already evidence through testing in 170

22    Amsterdam there are already inaccessible conditions in the four

23    apartments shown.  If we identify dozens more inaccessible

24    conditions there, that raises a strong likelihood that unless

25    something is done, the same problems are likely to recur at

1    these ongoing constructions.

2              That basically means these new buildings will go on

3    the market and they wouldn't comply with what Congress says is

4    required for new buildings.  That is creating irreparable harm

5    in a couple of different ways:

6              First, any time you have a violation of a statute

7    under the civil rights laws, that creates a presumption of

8    irreparable harm.  More specifically, such an abstract issue

9    because what happens, your Honor, if you can imagine, so let's

10   say eight months from now a new building opens, some of the

11   units are accessible but others are not, whether that creates a

12   scenario where people are able-bodied can rent any of the

13   apartments in the building, but people who were disabled and

14   only having access to some of the units or a few of the units,

15   and basically you have people with disability being treated in

16   that case as second-class citizens.  That is the scenario

17   Congress specifically wanted to not happen when it enacted this

18   requirement under the Fair Housing Act.

19             THE COURT:  If that is all true, why haven't you moved

20   for preliminary injunction?

21             MR. YU:  The last point.

22             Here this request for an inspection happened in the

23   context of ongoing discussions the parties already had.  In

24   those discussions defendants raised several points about

25   whether there are inaccessible conditions at 170 Amsterdam, how

1    isolated they are.  Their position seems to be even if there

2    are inaccessible conditions, they're limited to perhaps just

3    these four units, which we are skeptical.  I guess in theory it

4    is possible, so it happens these are the four units that aren't

5    accessible and on the day the tester went there they happened

6    to see just these four units.

7         Ultimately, we don't believe the parties are willing

8    to speculate as to that question before we proceed because an

9    inspection will create a pretty clear record.  From our side,

10   the reason we want to wait for a chance to do the inspection is

11   we believe that that will inform our decision what kind of

12   injunction to seek and ultimately whether to seek the

13   injunction at all because if defendants are right, there are

14   only inaccessible conditions in these four units or only five

15   units, the government may end up revisiting that question.

16        Our concern is at this point is if people saw four

17   units and they identified X number of conditions, and if there

18   were 26 types of units out there, there may be a lot more

19   issues that exist that we are not aware of, and that will help

20   the parties and help the court in terms of ultimately assessing

21   the preliminary injunction question.

22        Ultimately I suppose we could file a PI motion, but it

23   seemed to us that given the inspection, it is something that

24   can be done discrete in time and at a discrete level with

25   efficiency, and not wasting the court's time really favors

1    doing the inspection first so that the parties can assess this

2    question before we move forward with litigating what can be a

3    very contentious issue before the court.

4              THE COURT:  Is there specific authority for

5    inspections as part of sort of standard discovery in Fair

6    Housing Act cases?

7              MR. YU:  Your Honor, there is no specific authority.

8              We cite to Rule 34 which provides inspection of

9    premises, and that is a typical practice that is done.  In

10   fact, I believe this is the 13th of 15 cases our office has

11   filed in this district alone involving similar type of issues.

12             Typically we agree on an inspection protocol with the

13   defendants, and this is generally understood to be part of how

14   Fair Housing Acts are litigated.  The statute itself doesn't

15   provide for a specific authorization, but the rules, the

16   federal rules provide for an inspection in this situation.

17             Again just going back to the earlier point, because --

18   and this is a point the Maryland court recognized -- the Fair

19   Housing Act's accessible requirements are reflected in a series

20   of regulatory safe harbors objective and comprehensive.  So it

21   follows that in order for the court and the parties really to

22   assess how well buildings comply or don't comply, it is

23   important to kind of have a comprehensive and objective set of

24   evidence to compare here the conditions that exist and here is

25   what the law requires.  That is why we think an inspection is

1   very important.

2                THE COURT:  What exactly -- I know there is an

3   attached draft request for inspection which sets forth dates, I

4   believe three days, 8:30 to 5:30 at 170 Amsterdam Avenue for

5   inspection of all common areas and each type of unit.  I assume

6   that is what you're looking for.  What is the date you're

7   looking for?

8                MR. YU:  We explain in the cover letter to that

9   inspection request.  We want to be flexible and accommodate

10  whatever concerns within reason within the context of this

11  case, the scheduling concerns the defendants have.

12               Right now our expert who is going to do the inspection

13  has availability for three weeks from March 20th, he can be

14  here Sunday night, March 19th, and he can be here at any time

15  between March 20th to I believe April 7th, which is a Friday.

16  He has availability for that three-week period.  We hope to do

17  it consecutively, but we can certainly work around the schedule

18  with the defendants.

19               THE COURT:  Okay.  Thank you, Mr. Yu.  I'll hear from

20  counsel for defendants.  Let me start by asking, I think you

21  have a March 3rd date for answering or responding to the

22  complaint.  Is that right?

23               MR. WHITE:  Yes, your Honor, a week from today.

24               THE COURT:  Are you filing an answer?

25               MR. WHITE:  No, we will not.

1          THE COURT:  You're filing a motion?

2          MR. WHITE:  Yes.

3          THE COURT:  Under what rule?

4          MR. WHITE:  Rule 12.

5          THE COURT:  (b)(6) or (b)(1)?

6          MR. WHITE:  (b)(6), and one other subsection I can't

7    remember.

8          THE COURT:  Can you give me a highlight.

9          MR. WHITE:  Not a silver bullet, destroy-the-case kind

10   of motion, your Honor, it is a we can do better in terms of

11   pleading kind of motion.

12         THE COURT:  They can do better?

13         MR. WHITE:  They can do better, I meant.

14         THE COURT:  Are you requesting a stay of discovery in

15   connection with that motion?

16         MR. WHITE:  No, your Honor.

17         THE COURT:  My question for you is, these kinds of

18   inspections are pretty standard, it sounds like.  I know I've

19   heard about them in other similar cases.  As a litigator, I had

20   limited, but some involvement with Fair Housing Act litigation,

21   and I know that that has been arranged and it is fairly common.

22         If it is going to happen at some point, why not in the

23   next month or two?

24         MR. WHITE:  First, let me be absolutely clear.  I

25   agree 100 percent that inspections of properties in the context

1    of cases of this type are a normal part of discovery.  Our

2    problem is not that some day an inspection, inspection of 170

3    Amsterdam will occur.  Our problem is what is the rush?  Why do

4    we have to bend the rules?  The government bears the burden to

5    explain why the rules need to be bent.

6            In this case, all the government is offering is well,

7    we think, we think we plan on someday filing a motion for

8    preliminary injunction.  They're not very specific about what

9    that motion might say, which automatically kind of ties one

10   hand behind my back in terms of a fair fight.  Allowing

11   discovery when I don't even know what exactly the issues are

12   going to be might be a little unfair.

13           THE COURT:  Have you had discussions that indicate to

14   you what the, let's call them violations of safe harbor

15   portions provisions of the Fair Housing Act -- I think it is

16   four tester apartments, what the nature of those violations

17   are?

18           MR. WHITE:  All we really know about that is what the

19   complaint tells us, which is not very much.

20           THE COURT:  But an inspection is an inspection.  The

21   government comes in with their expert inspectors, take

22   pictures.  If there are violations of accessibility in an

23   apartment, you kind of know what the universe of possible

24   violations are.  I assume, we can sort of think about the types

25   of violations, a limited universe of types of violations, and I

1    don't know how there is prejudice to you in terms of this is

2    not like an interrogatory response where you kind of need to

3    know.  It is kind of a thing that exists in the world and

4    they're going to take pictures at some point.  I am still not

5    clear on how there is prejudice to you having it done now

6    versus later other than being annoying.

7          MR. WHITE:  Putting aside the latter observation, I

8    would simply quote from the only case we could find where

9    someone asked for expedited discovery because they intend to

10   file a preliminary injunction motion, which preliminary

11   injunction motion, according to what they said, involved

12   appointing a special master, if you will, to oversee

13   construction projects going on in other states, and that's the

14   Disability Rights Center case which is cited in our papers.

15          It is the only case that we could find that approaches

16   what the government has told us their anticipated preliminary

17   injunction is going to seek.  It doesn't have anything to do

18   with 170 Amsterdam.  It has to do with ongoing construction

19   projects in Seattle, San Francisco and Washington, D.C.

20          If that's where the fight is going to be when we get

21   to preliminary injunction, first I am having trouble making the

22   connection between 170 Amsterdam, a building that has been

23   completed for two years that had a different general

24   contractor, a different architect, different owner than any of

25   those other properties.

1          How is 170 Amsterdam going to be revealing about what
2     is going on at those projects?  I am also quite confident that
3     in this systematic disparate treatment case where the
4     government's burden is to show we intentionally discriminate,
5     we intentionally disregard the Fair Housing Act, they will not
6     be able to do that because my client does not, in fact, do
7     that.
8          Just by way of example, we have our own Fair Housing
9     Act consultants who consult on all three of those other
10    properties and are doing so on an ongoing basis throughout the
11    construction.  So the relevance of the inspection of 170
12    Amsterdam to an injunction seeking a fair housing monitor on
13    those projects is, frankly, lost on me.
14         THE COURT:  If there are widespread violations in
15    defendant-owned properties and there is a pattern here, you
16    know, the case that is before Judge Blake, the other
17    establishments, that would tend to make more probative the idea
18    that there is a pattern here.
19         MR. WHITE:  Respectfully, your Honor, I spent 10 years
20    of my life on that case before Judge Blake.  It was filed in
21    April of 2006, and we finally resolved it in December of 2017.
22    I know the details of that case intimately.
23         Judge Blake's opinion to which Mr. Yu referred
24    addressed seven properties out of over 300.  The defendant
25    prevailed on motion for summary judgment on 14.  That case

1    involved properties that were under construction a decade ago.

2    It has nothing whatsoever to do with this case and it couldn't

3    be offered for the truth of the matters asserted in any event.

4          The fact of the matter is this is a new case involving

5    different properties, different circumstances, and the question

6    is why are we in a rush?  Should we bend the rules?  Will there

7    be an inspection?  Absolutely.  But the only reason to rush is

8    the government's professed worry that something might be going

9    on in Seattle, Washington or San Francisco.  That's it.

10          THE COURT:  Fair enough, fair enough.  I see your

11   point.  You're saying it is too attenuated of a connection,

12   although there is some connection probably.

13          MR. WHITE:  That is one of the requirements under

14   Notoro, that there be a connection.

15          THE COURT:  Assume the standard is the kind of

16   flexible standard in terms of expedited discovery, it is all

17   the factors, it is a judgment call by the district court, which

18   is why I'm here.

19          The question I have is, you just told me you're going

20   to answer the complaint next week -- or not answer.  You're

21   going to move to dismiss, but not seek a stay of discovery,

22   acknowledge this inspection is going to happen.

23          My question is why not have the inspection happen

24   between March 20th and April 7th?

25          MR. WHITE:  Again, having conceded that inspections

1   are a normal part of discovery in cases such as this, which I

2   don't dispute, I will describe some of the inherent

3   difficulties.  I have been on 20 or more of these myself.  I

4   have encountered the little dogs that for some reason didn't

5   want people in the apartment that day.  I have encountered the

6   women who forgot they had the appointment and were dressed in a

7   towel.  I have seen the vases that were knocked off the coffee

8   tables.

9            THE COURT:  Do you go on the inspections?

10            MR. WHITE:  Have I been on them?  Yes, I have been

11   there.  These are intrusions into people's homes.  There is no

12   other way to put it.  The toys are all over the place, all the

13   circumstances one would expect to find when one enters another

14   individual's apartment.

15            THE COURT:  All those things, the towels and dogs and

16   everything, that happens whether it is in late March or in

17   July?

18            MR. WHITE:  There is no doubt that is true.  As the

19   landlord, you try to do everything you can to not deliberately

20   make your tenants angry.  The only way to do that is carefully,

21   conscientiously target a date out there in the future, do your

22   best because I think it is important to remind the court, we

23   don't have the ability to insist.  If they just say flatly no,

24   are we going to default them under their lease?  We can't.

25            THE COURT:  Isn't there a right of the landlord?

1            MR. WHITE:  A right of reasonable entry for certain

2    things.  This doesn't happen to fit one.  An inspection because

3    you're being sued isn't automatically one of those categories.

4            This is us saying pretty please, and I will inform the

5    court we have been fairly successful at achieving that kind of

6    cooperation from our tenants as long as there were some

7    restrictions on number of people, restrictions on the amount of

8    time.  You don't spend an hour walking around somebody's home.

9            There were adaptations made for people who weren't

10   home, but had pets, the usual thing that you can imagine, but

11   it takes a lot of planning.  It is a lot of work, especially

12   because, as Mr. Yu indicated, the expert, so to speak, usually

13   has a little tiny window they would like to get it all done.

14   If you could spread it out over, for example, common areas, no

15   problem, you can do that easily.  You don't have to ask

16   permission to go to common areas, but to get it all done in a

17   discrete time-frame, it takes lots of planning.

18           That is the only point here, together with the absence

19   of any of the criteria the case law holds for expediting

20   discovery over and above the normal rules.  The building is not

21   going anywhere.  We are not infringing, we are not

22   counterfeiting, we are not doing any of the normal things

23   associated with a desire to put a stop to something and

24   expedited discovery to accomplish that.  That building is

25   there.  It will always be there.

20

1      The inspection, we acknowledge, will occur.  It is

2  just doing it on an expedited basis, particularly the one that

3  was proposed, no good reason, a lot of work, probably couldn't

4  do it to the extent it was requested.

5      THE COURT:  What do you mean by that, that last point?

6      MR. WHITE:  Every unit of a certain type, 26 out of I

7  think 260 or maybe 300 -- in other words, a very particular

8  bullet point, not just a random call to your easiest 30 tenants

9  and see if they'll agree to this.  It has to be 26 unit

10  tenants.  That is 26, and that reduces your universe to -- I

11  don't know the dispersion of the 26, I am sorry.

12      There might be only four apartments of one type, so

13  that gives you just four tenants, and one of them has to answer

14  the pretty please call.

15      THE COURT:  But at any point, assuming you all can

16  arrange this within a three-day period, it is going to be

17  challenging at the end of March and early April and similarly

18  challenging in August or September.  I am still not hearing

19  why -- I know you have a legal argument which is well made

20  about bending the rules, but just as a practical matter, I am

21  still not hearing how it is that much worse at the beginning of

22  April than August or September.

23      MR. WHITE:  Not knowing anything about the tenant

24  reaction, I can't make a compelling argument that says the

25  aggravation level will be any different in August than it is in

1   April.  I can say the run-up planning is very important and

2   particularly if it has got to be a comprehensive kind of

3   inspection.

4          The agreements that we will have to make with the

5   government about who pays for the vase that someone knocks

6   over, bumps the table and knocks it on the floor, that kind of

7   thing, that normally is not a problem.  The amount of time we

8   are going to tell people that people will be in the room, how

9   many people, those kinds of sort of protective order things, we

10  can work those out.  I am not worried about that.

11         The principal objection I have here is accelerating

12  the case towards a preliminary injunction hearing about which I

13  know nothing because there is no motion on file; and,

14  therefore, I don't get to be much of a beneficiary of expedited

15  discovery because I don't know what the issues will be.  Mr. Yu

16  has a plan, apparently.  He wants expedited discovery to pursue

17  it.  I don't know what the plan is.  I don't have the same

18  opportunity to participate in the expeditedness of the

19  discovery.  That is where I think -- and the only reason

20  offered for even doing it is well, we're worried, we're worried

21  about projects under construction.

22         Logic will say we'd be here talking about those

23  projects, not 170 Amsterdam.

24         THE COURT:  Mr. Yu, would you like to respond.

25         MR. YU:  Your Honor, just very quickly.

1          I want to bring up a couple of points.  Let me first

2     address the question whether discovery will be a one or two-way

3     street.  I was a little bit surprised because they started the

4     process, defendant reached out to us to ask us about factual

5     questions once we filed the complaint.  We reached out to

6     Mr. White and said we want to do an inspection, make it a

7     two-way street.

8          If you guys want to do it quickly, we are interested

9     in moving quickly as well and we are willing to do that at this

10    point.  If there is an expedited inspection, we will answer

11    questions and produce documents if defendants wanted and so

12    every party will be in the same position.  That won't be an

13    issue for us.

14         In terms of the specifics, what we are seeking,

15    Mr. White has sort of alluded to this.  We actually provided

16    Equity with a sample of the kind of injunctive terms we are

17    thinking about, and we sort of actually invited Equity at some

18    point -- I don't want to go too far into settlement

19    discussions, but broadly invited Equity's input.  They didn't

20    give us input.  I don't think it is fair to say they don't have

21    a sense of the kind of relief we are seeking.

22         THE COURT:  Is the preliminary injunction relief

23    you're seeking, does it have anything to do with 170 Amsterdam?

24         MR. YU:  No.  The preliminary relief we are seeking

25    focuses on ongoing construction.  These are things we don't

H2OJUSAC                     Conference

1    have access to now.  They're in construction.  A, they want us

2    to have inspection people go into construction site because the

3    conditions may not be there yet; and, B, they approach probably

4    much larger safety issues.

5         The nature of the preliminary injunction, as the court

6    noted, is a question of pattern.  If for a number of years

7    Equity was aware of the problems as identified in the Maryland

8    case, and if after the case has been in litigation for a period

9    of time they built a new building that has endemic problems, as

10   we think the inspection will likely show, and we just note the

11   second attachment to our letter which is actually part of an

12   annual report, that 170 Amsterdam is one of the properties

13   identified as one of the Equity properties under construction

14   there.

15        All the other parties where we are talking about that

16   would be part, potentially part of the preliminary injunction

17   are in the same table.  The idea there is nothing tying these

18   things together, we don't think, will be borne out by the

19   evidence.  What we expect the evidence will show is that Equity

20   has a coordinated and centralized development and construction

21   practice.  These are people, the ultimate decision-makers are

22   the same whether the building is here or in San Francisco or

23   somewhere else.  Because of that, the same issues that occur

24   here, there is a strong likelihood they would be a problem

25   somewhere else unless there is some process through which they

1    can be addressed before the building opens up for residents.

2              THE COURT:  Well, I am going to grant the request and

3    direct the parties to attempt to seek resolution on a three-day

4    period in the period March 20th to April 7th identified by the

5    government.  This is even though I think defendant makes a good

6    argument about the cart coming before the horse in a sense, in

7    that the government is seeking expedited discovery in order to

8    file a preliminary injunction, which is not the usual way of

9    doing things.

10             However, the reason I am persuaded that the overall

11   standard of good cause is met is because I think it is

12   appropriate in this case to start discovery anyway in the case

13   because we're essentially, we will be soon at the point of

14   doing that.  I am going to direct the parties to submit

15   within -- let's see, the motion or answer is due March 3rd -- I

16   will direct the parties by March 10th to submit a case

17   management plan.  On the court's web site there is a proposed

18   case management plan under my page on the Southern District web

19   site, and I will direct the parties by March 10th to attempt to

20   reach agreement on the case management plan.

21             Given I am beginning discovery and I think it is

22   appropriate to have inspection early in the discovery period,

23   in any event, I am going to direct the parties to work out a

24   three-day period in that March 20 to April 7th period to

25   arrange for the inspection.  It seems clear the inspection is

1    going to happen at some point.

2              I think the tester information gives some basis to go

3    forward with the case on the ground that they may argue you

4    believe there are Fair Housing Act violations here, and I think

5    that is enough to warrant an inspection at some point, and

6    defendant doesn't really contest that.  It might as well be

7    early in the discovery period, all right?

8              MR. YU:  Thank your Honor.

9              THE COURT:  Thank you, folks.

10             We're adjourned.

11             (Court adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25